**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| WILLIAM J. FRENCH and<br>SANDRA M. FRENCH, individually and on<br>behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE NORTHWESTERN MUTUAL LIFE<br>INSURANCE COMPANY and<br>NORTHWESTERN MUTUAL LONG-<br>TERM CARE INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION NO. _____<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs, William J. French and Sandra M. French, on behalf of themselves and others similarly situated, for their Complaint against Defendants The Northwestern Mutual Life Insurance Company ("NML") and Northwestern Long-Term Care Insurance Company ("NLTC"), allege, on information and belief, except for their personal information, as follows:

### NATURE OF THE CASE

1.      Plaintiffs bring this action to obtain relief for unlawful alterations to the terms of Individual, Tax-Qualified, Guaranteed Renewable, Comprehensive, Long-Term Care Insurance Policies ("QLTCI Policy," "Policy," or "Contract") that Plaintiffs purchased from Defendants.

2.      In August 1996, Congress enacted the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104–191, 110 Stat. 1936, 2054 and 110 Stat. at

2065t, which, among other things, added to the Internal Revenue Code of 1986 (the "Code") provisions that regulate, *inter alia*, the terms, and federal tax consequences of QLTCI contracts.

3.     In August 2007, while living in Texas, each Plaintiff purchased a QLTCI Policy from NLTC, a wholly owned subsidiary of NML.

4.     On May 2, 2018, NML advised Plaintiffs that: (1) effective on August 8, 2018, each Plaintiff's Annual Premium of $6,679.30 would be increased by $1,878.50 and that, (2) effective August 8, 2021, each premium would be further increased an additional $2,407.20, for a total increase of $4,285.70.  NML revealed to policyowners neither the discriminatory nature of these increases nor that they were expected to cost all policyowners over $10 billion in premiums in a manner contrary to law.

5.     HIPAA added §7702B "Treatment of Qualified Long-Term Care Insurance" to the Code.  Section 7702B(b)(1) provides that a QLTCI contract must be "Guaranteed Renewable," as defined by §7702B(g), the Code's "Consumer Protection Provisions." These are based on provisions of the Model Long-Term Care Regulation 1993, adopted by the National Association of Insurance Commissioners ("NAIC"), an organization composed of the insurance commissioners for the District of Columbia, the 50 States (collectively, "the 51 States"), and five U.S. territories. They: (1) prohibit unilateral alteration of any provision of the Contract by the insurer; (2) permit premiums to be altered on the basis of one guaranteed renewable class in accordance with the issuer's experience with that class, and (3) require that, in addition to the Code, an insurer must also comply with any "more stringent" LTCI requirements adopted by a state. To ensure these terms are met, Congress, among other things, required insurers to "describe clearly and concisely" each "circumstance under which [*sic*] premium may change."

6.      NML's Rate Increase Filings unilaterally altered these terms. Rather than one guaranteed renewable class as required by law, NML apportioned its increases in a discriminatory manner among certain of its innumerable "classes" and "subsets of classes" that it secretly created and long-concealed from regulators and policyowners. Further, it did not base its rate increases on the claims experience of its policyowners; rather, it based them on the experience of strangers to the policy.  NML's unilateral contract alterations violated those provisions of the Code, IRS Regulations, State LTCI Regulations and the Contract intended to protect policyowners from unlawful rate increases.

7.      In such a situation, a regulated party cannot escape a contractual obligation to furnish its counterparty with a product at an agreed rate by unilaterally filing with the regulator a schedule that increases the counterparty's rates.  *See United Gas Co. v. Mobile Gas Corp.*, 350 U.S. 332 (1956) &  *FPC v. Sierra Pacific Power Co.,* 350 US 348 (1956).

8.      While *Mobile* acknowledges that the "'filed-rate' procedure applies to changes in contracts," it *holds* that this means "only that contracts may be changed, *not that they may be changed unilaterally.*" *Mobile,* 350 U.S. at 340 (emphasis added). In fact, the "filing requirement" is nothing more than "a *precondition* to changing a rate"; it is "not an *authorization* to change rates in violation of a lawful contract." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*, 554 U.S. 527, 533 (2008) (emphasis in original). Nor is a state regulator authorized to accept a Rate Increase Filing contrary to federal law or to a valid contract.  Federal common law voids unilaterally altered contracts and rate increases based on unilaterally altered contracts.  Contracts that comply with the Code have the status of a filed tariff; those that do not are void.

# I.    JURISDICTION AND VENUE

9.    Plaintiffs are citizens of Connecticut residing in Essex, Connecticut, having moved there from Texas in 2011.

10.    NML, a mutual insurance company organized under Wisconsin law, has its principal place of business in Milwaukee, Wisconsin.  NML is licensed to do and is doing business in Wisconsin, Texas, and other states. As a mutual company, NML is owned by its policyowners.

11.    NLTC, an insurance company organized under Wisconsin law, has its principal place of business in Milwaukee, Wisconsin. NLTC is licensed to do and is doing business in Wisconsin, Texas, and other states.

12.    The Court  has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §§1332(d), 1453 and 1711–1715, because this action involves approximately 170,000 policyowners residing across the county with claims similar to Plaintiffs,' and the amount in controversy, as measured by their aggregate claims, is well in excess of $1 billion, exclusive of interest and costs.

13.    Venue is proper in Wisconsin pursuant to 28 U.S.C. §1391(b)(1) and (2).

# II.    NLTC IS NML'S ALTER EGO

14.    Pursuant to agreements between NML and NLTC, NML provides all legal, accounting, investment, marketing, and information technology services necessary for NLTC's operations.  NLTC has no employees and its QLTCI policies are sold exclusively by NML's captive sales force. At all times material, NML dominated and controlled NLTC to the point that separate corporate personalities did not exist. NLTC is an *alter ego* of NML and references to NML include both NML and NLTC, unless the context otherwise requires.

### III. THE LONG-TERM CARE INSURANCE INDUSTRY

15.     Long-Term Care Insurance (LTCI) is intended to pay for a variety of services for people who are unable to care for themselves. LTC services include assistance in the home or in an institution, such as a nursing home. Consumers of LTCI are advised that by purchasing it at an early age, they can secure more favorable premium rates than would otherwise be available.  LTCI holds out the promise that, by paying reasonable premiums while policyowners are relatively young and healthy, they will be protected by that coverage against significant health care expenses in their later years.

16.     The McCarran Ferguson Act of 1945, 15 U.S.C. §§1011-1015, exempted the business of insurance from indirect federal regulation, which permitted states to regulate the health insurance industry with little federal oversight.  This lack of oversight allowed abuses to thrive in the LTCI industry. Dishonest LTC insurance, formerly "Nursing Home Care Insurance," sales practices were exposed in hearings by Congress in 1978.  *See* "Abuses In The Sale Of Health Insurance To The Elderly," Hearing Before The Select Committee On Aging, House of Representatives Ninety-Fifth Congress Second Session, November 28, 1978.  Yet, aside from occasional hearings, Congress proved unwilling and the states proved unable to stem the tide of abuses—which proliferated.

17.     Certainly, the abuses continued into the mid-1990's.  Speaking in support of a Bill entitled, "Long-Term Care Insurance Tax Treatment and Consumer Protection Act," a precursor to HIPAA's Long-Term Care Insurance provisions, one Congressman observed in 1995 that:

> Abuses of consumers in the long-term care insurance market are so severe–so severe–that a past president of the [NAIC] has said that the very viability of this product is in question.

Congressional Record Volume 141, Number 65 (Friday, April 7, 1995) (remarks of Hon. Fortney Pete Stark).

## IV. THE LAW DEFINES THE CRITICAL TERMS OF A QLTCI CONTRACT

### A. PROVISIONS OF THE INTERNAL REVENUE CODE AND IRS REGULATIONS

#### 1. THE CODE PERMITS ONE GUARANTEED RENEWABLE CLASS FOR EACH INSURER'S QLTCI POLICY TYPE

18.     If the language of a statute or regulation is plain, "the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917). Legislation enacted by Congress is presumed to say what Congress means and to mean what Congress says. Such legislation is likewise presumed to comply with the rules of grammar. A statutory term that has an established legal meaning must, absent clear instructions to the contrary, be interpreted in light of that meaning. Regarding guaranteed renewable contracts, Congress uses the term "class" to mean one class, it uses the term "classes" to mean more than one class. Nor has Congress authorized insurers to interpret the term "class," as used in HIPAA, as other than a singular term; indeed Congress, the IRS, and NML's Contracts permit only a singular construction.

19.     In August 1996 Congress, by HIPAA, added §7702B(a)(5) to the Code. It provides that a "[QLTCI] contract shall be treated as a guaranteed renewable contract subject to the rules of section 816(e)."[1] Code §7702B(b)(1) defines a QLTCI contract as one that is "guaranteed renewable" and meets the requirements of Code §7702B(g), the Code's "Consumer Protection Provisions."

20.     The term "guaranteed renewable," as used in the Code, has a long history. In 1959 Congress enacted the Life Insurance Income Tax Act, which amended the Internal Revenue Code of 1954 by adding §801(e) to provide that, "[f]or purposes of this part, guaranteed renewable life,

---

[1] Section 801(e) of the Code of 1954 was renumbered §816(e) by the Tax Reform Act of 1984.

health and accident insurance shall be treated in the same manner as noncancellable life, health and accident insurance."

21.     The House Finance Committee Report concerning §801(e) states as follows:

> *Guaranteed Renewable contracts*—The bill provides that guaranteed renewable life, health and accident insurance will be treated in the same manner as noncancellable life, health and accident insurance.  Reserves with respect to such insurance will, therefore, be treated in the same manner as life insurance reserves for purposes of computing taxable investment income and gains from operations. ***The type of insurance contracts referred to are life, health and accident policies which are not cancellable by the company but under which the insurance company reserves the right to adjust premiums rates by classes in accordance with experience under the type of policy involved.*** (emphasis added).

22.     By virtually identical language, the Senate Report also emphasized that a rate increase must be based on the policy type and not on a policy form or policy option.  Thereafter, the IRS promulgated regulation §1.801-3(d), which embodies that requirement in a rule of law, as follows:

> *Guaranteed renewable life, health and accident insurance policy.*  **The term "guaranteed renewable life, health and accident insurance policy" means a health and accident contract or a health and accident contract combined with a life insurance or annuity contract,** *which is not cancellable by the company but under which the company reserves the right to adjust premiums by classes in accordance with the experience under the type of policy involved,* and with respect to which **a reserve** in addition to the unearned premiums (as defined in paragraph (c) of this section) must be carried to cover **that obligation.** (emphasis added).

23.     Congress, in the legislative history of §801(e), and the IRS, in Reg. §1.801-3(d), used the term "classes" when referring to more than ***one guaranteed renewable policy type***, each of which requires a separate class which aggregates an insurer's experience of the type of policy involved.  However, when a single guaranteed renewable policy type is referred to, Congress and the IRS used the singular term "class."

24.     The Code's Consumer Protection Provisions adopt provisions of the NAIC's Model LTCI Act 1993 and Model LTCI Regulation 1993 (the "Model LTCI Act" and "Regulation 1993").

The most significant of these is NAIC Model Regulation Sec. 6. A. (2), which the Code incorporates at §7702B(g)(2)(A)(i)(I) (but misidentifies as Sec. 7. A. (2)). By its use of singular terminology, the NAIC—and therefore Congress—permitted only one QLTCI class, as follows:

> The term 'guaranteed renewable' may be used only when the insured has the right to continue the long-term care insurance in force by the timely payment of premiums and when the insurer has no unilateral right to make any change in any provision of the policy or rider while the insurance is in force and cannot decline to renew, *except that rates may be revised by the insurer **on a class basis.*** (emphasis added).

25.    The singular term "on a class basis" adopted by Congress in §7702B(g)(2)(A)(i)(I) echoes the singular terms used in the legislative history of §801(e) and in IRS Reg. §1.801-3(d)—*i.e.,* "in accordance with *the experience* under *the type* of policy involved"—to confirm that a premium increase for a guaranteed renewable contract must be based on a single aggregate experience for each policy type.

26.    The NAIC's "Long Term Care Insurance Personal Worksheet" provides that "by state law the insurance company must fill out a portion of the information on the worksheet," including the line requiring disclosure of the "Type of Policy (noncancellable/guaranteed renewable)." Accordingly, the Long-Term Care Personal Worksheet that Plaintiffs received specifically identifies the "*Type of Policy*" as "*Guaranteed Renewable.*" (emphasis added).

27.    To comply with the Code, a QLTCI policy premium increase must not discriminate—a paramount requirement of Congress in legislation of this type. The rule is violated when similarly situated consumers are required to pay different rates for the same services. Only if a rate increase for similarly situated policyowners is assessed by an equal percentage across each of the insurer's single QLTCI class of similar policies is discrimination avoided as ***each policyowner receives a uniform percentage increase, and thereby remains in the same premium position vis-à-vis other similarly situated policyowners.***

8

## 2. THE IRS QLTCI REGULATION PERMITS ONLY ONE GUARANTEED RENEWABLE UNDERWRITING CLASS

28.     In January 1999 the IRS promulgated its "final Income Tax Regulations relating to consumer protection with respect to [QLTCI contracts] and relating to events that will result in the loss of grandfathered status for [LTCI contracts] issued prior to January 1, 1997."

29.     Paralleling the Code's prohibition against unilateral alterations by an issuer of a QLTCI Contract, IRS Reg. §1.7702B instructs that the Code's NAIC-based provisions must be followed precisely, as follows:

> "Sections 7702B and 4980C reference NAIC model provisions that *specify exact language* (including punctuation), format, and content that must be included in long-term care contracts, applications, outlines of coverage, policy summaries, and notices." (emphasis added).

30.     The Regulation further provides that a LTCI contract issued prior to January 1, 1997, the effective date of HIPAA's Code amendments, may be exchanged without tax consequences for a QLTCI contract if, among other things, the replacement policy meets the Code's requirements for a QLTCI contract by providing for "*a comprehensive increase or decrease in premiums for contracts that have been issued on a guaranteed renewable basis*." (emphasis added). The IRS's use of the term "classwide" refers to all "contracts that have been issued on a guaranteed renewable basis," which is to say the single QLTCI class that the Code permits.

31.     In this context, "*comprehensive* increase or decrease in premiums for contracts that have been issued on a guaranteed renewable basis" evinces the IRS' understanding that Congress intended that policyowners who purchase a particular guaranteed renewable "policy type" be included in one all-inclusive class based on that policy type.  Because all of NML's QLTCI

contracts were "issued on a guaranteed renewable basis," all of its QLTCI policyowners, by law, must be in a single *classwide* Guaranteed Renewable, Comprehensive Class.

32.     Consistent with §7702B(g)(2)(A)(i)(I), IRS Reg. §1.801—3(d) further provides that reserves for guaranteed renewable policies must be calculated on a single guaranteed renewable class basis, *i.e., based on the policy type,* which is how NML calculates its QLTCI reserves.   On May 24, 2017, it advised the Texas Department of Insurance ("TDI") that it "performed asset adequacy testing on our *LTC block in the aggregate.*  The Additional Reserves … due to asset adequacy *testing are calculated in aggregate for the product line and are not attributed to specific contracts or forms*." (emphasis added).

### 3.     THE OUTLINE OF COVERAGE REQUIRED BY THE CODE PERMITS ONLY ONE GUARANTEED RENEWABLE UNDERWRITING  CLASS

33.     HIPAA also added §4980C to the Code, "Requirements for Issuers of Qualified Long-Term Care Insurance Contracts." Subsection 4890C(c)(1)(A)(vi) incorporates NAIC Model Regulation 1993 "Section 23 (standard form outline of coverage)" (but misidentifies it as Section 24), which requires issuers to provide prospective policyowners with an Outline of Coverage.

34.     The Outline of Coverage, as set forth in NAIC 1993 Model Regulation 23, at ¶ E. 3. (d), requires an insurer to:  "State whether or not the company has a right to change premiums and if such right exists, *describe clearly and concisely each circumstance under which the premium may change."* (emphasis added).

35.     NML's TT.LTC Policy states that premiums may be changed "by class," while the TT.LTC Outline states that the "Company has the right to change premiums on a class basis."

36.     Whether its Outlines state that "Premiums may be increased by class" or that "[t]he Company has the right to change premiums on a class basis," NML chose terminology that permits only one QLTCI Policy Class.  Attached hereto as Exhibit A is a copy of the Outline Plaintiffs

received.  Because NML's Outline does not comply with the Code, the Outline Form identified by the Code is part of the Contract as a matter of law.

### B.  THE CODE REQUIRES INSURERS TO COMPLY WITH ANY MORE STRINGENT STATE LTCI REQUIREMENTS THAN THOSE IMPOSED BY THE CODE

37.    Code §7702B(a)(5) requires that a QLTCI "contract *shall be treated as a guaranteed renewable contract* subject to the rules of section 816(e)."  IRS Reg. §1.801-3(d) is one such rule. It provides examples of guaranteed renewable policy types, such as life, accident, and disability policies, and permits issuers to "***adjust premiums by classes in accordance with the experience under the type of policy involved.***"  (emphasis added). As alleged above, by requiring premiums to be adjusted based on an insurer's aggregate experience with a particular policy type, here the QLTCI Policy—but not by policy form, policy option, or state of issue—the  regulation permitted NML only one guaranteed renewable QLTCI policyowner class.

38.    Code §4980C(f) permits states to impose on QLTCI policies "more stringent"[2] requirements than does the Code. As adopted by the TDI, the Similar Policy Forms Regulation more precisely subdivides such guaranteed renewable policies into three ***policy types***, as follows:

> (18) Long-term care benefit *classifications*—Institutional [LTCI] benefits *only*, non-institutional [LTCI] benefits *only*, or Comprehensive [LTC] benefits;

> (30) Similar Policy Forms—All of the [LTCI] insurance policies … issued by an insurer in the [LTCI] benefit *classification* as the policy form being considered.

39.    In late 2001 the TDI amended Subchapter Y, the Texas Long Term Care Insurance Regulation, to ensure, among other things, that policyholders "affected by [LTCI] rate schedule increases are protected" and that their policies "contain appropriate terms."

---

[2] Stringent, "(of regulations, requirements or conditions) strict, precise, and exacting."  The New Oxford American Dictionary, Oxford University Press, New York, 2001 at 1687.

40.     The most important of the amendments are:  (1) the Similar Policy Forms Regulation ("Similar Policy Forms"), which was added to Subchapter Y's definitions section as §3.3804(b)(18) and (30) TAC, and (2) the Potential Rate Increase Disclosure Regulation ("Rate Increase Disclosure"), which was added as §3.3829 TAC.  Effective in Texas on January 6, 2002, they parallel NAIC Model LTCI Reg., 2000 [October], Secs. 4. D. and 9. D., respectively.  Forty-nine of the 51 States adopted the Similar Policy Forms, while 50 States require insurers to provide the Rate Increase Disclosure Form to prospective policyowners. The Rate Increase Disclosure Form Plaintiffs received is attached hereto as Exhibit B.

41.     Because the Similar Policy Forms imposes "more stringent" requirements than the Code, §4980C(f) requires that NML's QLTCI Policies comply with these Similar Policy Forms classifications in order to comply with Code. As NML sold only Comprehensive QLTCI Policies, under the Code and state law these policies are both "guaranteed renewable" and "comprehensive" policy types that belong in one class only.

42.     The Rate Increase Disclosure is also more stringent than Code §816(e) and IRS Reg. §1.801-3(d) but in a different respect.  For, unlike federal law, it requires that issuers *actually disclose* to prospective insureds that "…*rates may go up based on the experience of all insureds with similar policies."*(emphasis added).

43.     Section 3.3804(a) TAC provides that "*No long-term care insurance policy…may be delivered or issued for delivery in this state, **unless it complies with and contains definitions in conformance with, this subchapter**."* (emphasis added). Although none of NML's QLTCI Policies contains the definitions in §§3.3804(b)(18), (30) or §3.3829, their terms are nonetheless a part of each Policy as a matter of law.

## C. RIGHT TO REDUCE COVERAGE AND LOWER PREMIUMS

44.     In 1960, based on the legislative history of the 1959 Life Insurance Income Tax Act, the IRS promulgated Reg. §1.801-3(d), which permits only one class for each guaranteed renewable policy type issued by an insurer.  Guided by that direction, in 1990, the NAIC's Model Long-Term Care Regulation 1990 used the singular term "on a class basis" in defining a guaranteed renewable LTCI contract. Following the NAIC's lead, State LTCI regulations also adopted the singular term "on a class basis."  In 1996, Congress also employed the singular term, "on a class basis," in HIPAA's amendments to the Code.  The central presumption guiding the construction of statutes and regulations should therefore be applied to the NAIC's expertly drawn Model LTCI Regulation 1990 as well – that the NAIC meant what it said and said what it meant precisely because, in 1959, Congress meant what it said and said what it meant.

45.     NML's Rate Filings in 2001 and 2008, and its Rate Increase Filings in 2017 with the TDI for its RR.LTC Series Policies state that "[o]ne underwriting class exists for all policies issued."  NML's Rate Filings and Rate Increase Filings for its TT.LTC Series Policies state that three underwriting classes exist.

46.     In 2014, the NAIC adopted Model LTCI Regulation Sec. 27. C. (1), "Right to Reduce Coverage and Lower Premiums," which permitted those who purchased policies after a state's adoption of the regulation to reduce premiums by reducing benefits based on "the same age and underwriting class used to determine the premium for the coverage currently in force." Here, because NML had not previously received a rate increase, this regulation refers to NML's original underwriting class.

47.     Sec. 27. C. (1) is consistent with the "one class" interpretation of Model LTCI Regulation Section 6. A. (2)'s term "on a class basis" as adopted by the Code by requiring issuers

to use the original QLTCI underwriting class, *i.e.,* the Guaranteed Renewable, Comprehensive Class, for a rate increase.

48.    NML's rate increases were not based on one underwriting class; they were based on numerous, unauthorized, fictitious classes that it used to impose discriminatory rates on its QLTCI policyowners.  NML's fictitious classes have no basis in law or the Contract.

## V.    NML'S RATE FILINGS, MARKETING MATERIALS, AND POLICY TERMS

### A.    NML'S RATE FILINGS FOR THE RS.LTC.1101 POLICY

49.    Before selling a new QLTCI policy in Texas, an LTC insurer must submit a Rate Filing to the TDI that includes an Actuarial Memorandum and Actuarial Certificate, the policy form, and other materials to enable regulators to determine if the proposed policy and its design comply with governing law.  The Certificate must state, in part, that the actuary considered the policy design in determining the initial premium schedule and that the filing "…complies with the laws and regulations of your state…".  NML's Rate Filings were standardized forms in all material respects irrespective of the state in which the Contract was issued.

50.    On March 2, 2002, NML submitted a Rate Filing for its RS.LTCI Contracts to the TDI, in which it described the policy design as a "tax qualified long-term care policy under the requirements of [HIPAA].  They are also designed to follow all of the requirements of the NAIC [LTCI] Model Act and Regulation."

51.    The TDI rejected NML's application on the grounds that it failed to comply with provisions of the Code and the TDI Regulations. Over the next year, NML revised and resubmitted documents until, on March 28, 2002, the TDI permitted the policy to be sold in Texas.

52.    In December 2008, NML filed an application to amend the RS.LTC.(1101) Policy and to merge it with a new RS.LTC.(0708) Policy form, which offered features not provided by

the RS.LTC(1011) Policy. NML's cover letter represented that, "[t]he policy, including additional benefits, is a tax-qualified long-term care policy under the requirements of [HIPAA]. It is also designed to follow all of the requirements of the NAIC [LTCI] Model Act and Regulation."

53.    NML's application was again rejected on the grounds that it did not comply with the Code and the TDI's LTCI Regulations. As before, NML eventually received permission to sell the new policy form.

54.    Each of NML's RS.LTC Rate Filings before 2016 included an Actuarial Memorandum that stated, in part, that "[o]ne underwriting class exists for all policies issued." No other class was hinted at in any NML Rate Filing before 2016.

### B.    NML's Rate Filings for the TT.LTC.1010 Policies

55.    In or about February 2010, NML submitted to the TDI Rate Filings for approval to sell its TT.LTC.1010 and TT.LTC.LP.1010 Policies (the "TT.LTC Contracts"). On April 28, 2010, the TDI rejected them on the grounds that they failed to comply with provisions of the Code and State LTCI Regulations.

56.    On June 9, 2010, NML resubmitted Rate Filings for its TT.LTC.(1010) Contracts. The Actuarial Memorandum stated that three underwriting classes exist: standard, class 1, and class 2, none of which was identified as a Guaranteed Renewal, Comprehensive Policy Class. Nevertheless, the TDI permitted NML to sell its TT.LTC Policies in Texas.

### C.    NML's Marketing Materials

57.    In April 2007, Plaintiffs met with an NML agent to discuss the purchase of NML's QLTCI Policies. At that time, they received an NML "Proposal," which, on ten of its 13 pages, stated that "*the Company retains the right to change premiums by class.*" (emphasis added). The term "class" was not defined and no "class" was identified.

58.     Plaintiffs also received an NML Brochure ("Brochure") describing the RS.LTC Policy, which states that "*Due to the guaranteed renewability [term], premiums will only be changed if all policies of the same form* (*sic*) *in your class are changed*."  (emphasis added). The term "class" was not defined and no "class" was identified.[3]

59.     The Brochure explained that Plaintiffs had the choice of three Benefit Periods: a 3-year, a 6-year, or a Lifetime Benefit Period. Each Plaintiff selected the Lifetime Benefit Period that provided an Unlimited Account Value.  Nothing in the Brochure or any other document provided by NML suggested that it considered a Benefit Period to be a "class" for purposes of a Rate Increase Filing.

60.     In August 2007, Plaintiffs purchased Individual, Tax-Qualified, Guaranteed Renewable, Comprehensive, Long-Term Care RS.LTC Insurance Policies from NML.

### D.     THE TERMS OF NML'S QLTCI CONTRACTS PERMIT ONLY ONE CLASS

61.     NML manages billions of dollars in assets for 4.5 million clients, whom it expects to rely on the precise terminology it uses in its policies for, as it has stated, NML:

> … strives to offer high-quality, long-term product value by utilizing careful underwriting, vigilant expense control, and prudent but productive investment practices. The result is customer loyalty, which is perhaps the truest measure of customer satisfaction *as well as an indication that the products were clearly explained and fully understood in the first place*. (emphasis added).

62.     The RS.LTC Policy is a standard form without material difference in terms irrespective of its state of issue.  Pursuant to Code §4980C(d), the face page of the Policy states that: **"This policy is intended to be a qualified long-term care insurance contract under section 7702B(b) of the Internal Revenue Code of 1986,"** and further that "[t]his long-term policy is guaranteed renewable for life upon timely payment of premiums for the life of the Insured

---

[3] Nor did NML's use of the term "policies of the same form" comply with IRS Reg. 1.801-3(d), which uses the term "policy type" not "policy form."

and can neither be canceled nor have its terms, other than premiums, changed by the Company."

(emphasis added). Because NML could not unilaterally change any term of the Contract, it could

not change the statement of intent. Plaintiffs' Policy Form is attached as Exhibit C.

63. The Policy variously states: "Premiums Subject to Change by Class"; "Premiums

may be changed by class," and "Premiums can be changed by class." Although the Policy refers

to NML's right to change premiums "by class" five times and contains 4+ pages of definitions,

the term "by class" is not defined.

64. Each Policy defines Plaintiff's "Benefit Account Value" as "Unlimited" and states

that "[a]ny provisions of this Policy, which, on the date of issue, are in conflict with the statutes of

the state of Issue on that Date are amended to conform to such statute," while its integration clause

provides, in part, that, "[t]his Policy, with the application and attached endorse-ments, is the entire

contract between the insured and the Company. No change in this policy is valid unless approved

by an officer of the Company."

65. In 2010, NML introduced its TT.LTC Policies, the material terms of which

are the same in all material respects as those of the RS.LTC Policy.

66. In October 2007, NML mailed the Policies to Plaintiffs, but not until November 8,

2018—some 11 years later and only after Plaintiffs objected to its unauthorized rate increases—

did it identify for Plaintiffs and, so far as Plaintiffs are aware, *only Plaintiffs*, its innumerable and

fictitious "classes" and "subsets of classes."

67. NML did not advise regulators or policyowners that it claimed the right to recognize

a class for rate increase purposes other than a class permitted by law. However, its documentation

neither used the plural terms "classes" or "bases" nor did it define the terms "class," "class basis,"

or "similar policy." Ambiguity is, of course, prevented by NML's own singular terminology that permits only one class consistent with the Code and IRS Regulation.

## VI.    NML'S QLTCI POLICY DEATH SPIRALS

68.    In April 2011, NML closed the RS.LTC Policy Block. When a policy block is closed, claims, as a percentage of premiums, increase as premiums decline. Simultaneous claim increases and premium decreases may result from two factors well-known to the industry: (1) when policyowners go on claim their premium payments stop; and (2) when a policy block is closed, new policyowners, who would replace such lost premiums, are not recruited. Thus, expenses increase as revenues decline, a tactic LTC insurers have long used to create the impression that a rate increase is necessary. The industry refers to this as a "policy death spiral."

69.    That the tactic of closing a block is intended to increase rates and not to end an unprofitable "product line" is apparent if the insurer has available a new—and similar—policy ready to absorb the demand that might otherwise be lost by closing a block. That was clearly the case here.

70.    The dates of NML's Individual, Tax-Qualified, Guaranteed Renewable, Comprehensive, LTCI policy block offerings and closings and are itemized in Table A, below:

**TABLE A**

| NML's Consecutive Guaranteed Renewable, Comprehensive Policy Blocks | | |
|---|---|---|
| **Date** | **Policy ID** | **Action** |
| March 2002 | RS.LTC.(1101) | Introduced |
| May 2002 | RR.LTC.(0798) | Discontinued |
| August 2008 | RS.LTC.(0708) | Introduced |
| August 2008 | RS.LTC.(1101) | Discontinued |
| July 2010 | TT.LTC.(1010) | Introduced |
| April 2011 | RS.LTC.(0708) | Discontinued |
| November 2012 | TT.LTC.(1013) | Introduced |
| March 2013 | TT.LTC.(1010) | Discontinued |
| March 2014 | UU.LTC.(1014) | Introduced |

| January 2015 | TT.LTC.(1013) | Discontinued |
|---|---|---|
| July 2016 | UU.LTC.(0916) | Introduced |
| September 2016 | UU.LTC.(1014) | Discontinued |

71. The tactic becomes even more insidious as each additional rate increase is sought. Initial rate increases tend to drive policyowner lapsation, which, by causing further premium declines in relation to claims, necessitates further increases.

72. In April 2011, shortly after introducing the TT.LTC.(1010) Policy, NML closed its RS.LTC Policy Block. Thereafter, as NML expected, claims as a percentage of premiums increased. Yet, NML advised regulators that it "remain[ed] in the market and currently sells similar long-term care insurance."

73. In March 2013, shortly after introducing the TT.LTC.(1013) Policy, NML closed its TT.LTC.(1010) policy block. In a subsequent Rate Increase Filing, NML complained of "higher anticipated higher lifetime loss ratios" but "remain[ed] in the market and currently sells similar long-term care insurance."

## VII. NML'S RATE INCREASE FILINGS VIOLATE THE CODE AND STATE LTCI REGULATIONS

### A. NML'S RATE INCREASE FILINGS UNILATERALLY ALTERED THE POLICY DESIGN

74. From late 2016 into 2019, NML presented to the 51 State Insurance Commissions Rate Increase Filings for its RS.LTCI and TT.LTC policies, which Filings were identical in all material respects. The premise of its Filings was that, among other things, premium increases were necessary to meet anticipated costs of future claims; no claim of past losses was made, as NML had not experienced any.

75. Although NML knew that regulatory approval for any change in a QLTCI policy form was required, it did not seek, much less receive, regulatory approval for its fictitious

"classes." From 2002 until 2016, NML's RS.LTC Rate Filings mention only one "underwriting class" while omitting mention of a "Guaranteed Renewable, Comprehensive" policy class.

76.     Beginning in 2016, NML's Rate Increase Filings refer to its fictitious "benefit period" classes, among numerous others, under the heading "Premium Classes." But its fictitious "state of issue" class is not mentioned in any Rate Filing or Rate Increase Filing. Insofar as Plaintiffs are aware, NML's "state of issue classes" *only* appear in the letter to them from NML's Assistant General Counsel dated November 8, 2018, discussed more fully below.

## B.    NML'S RATE INCREASE FILINGS DISCRIMINATE AGAINST POLICYOWNERS

77.     NML's original premium schedules confirm that it took into consideration the increased risk to which it was exposed by longer benefit periods. Thus, relative cost differentials between the three Benefit Period Options were built into NML's original rate schedules.

78.     However, as Table B demonstrates, NML's rate increases multiplied the established rates in a manner that discriminated against the 6-year and the Unlimited Benefit Period Policyowners, the latter comprising about 60% of the 94,920 RS.LTC Policyowners.

79.     As demonstrated by Table B, NML's discrimination against the RS.LTC Policyowners who selected the Unlimited Benefit option or the 6-year Benefit Period option, as opposed to those who selected the 3-year Benefit Period option, is self-evident.

### TABLE B

| RS.LTC. Policies | | | | |
|---|---|---|---|---|
| Benefit Period Option | Hypothetical Premium Differential | An Equal 10% Premium Increase | NML's 10%, 20% and 30% Increase | % Difference |
| 3-year | $10 | $1 | $1 | 0% |
| 6-year | $20 | $2 | $4 | 100% |
| Unlimited | $30 | $3 | $9 | 300% |

80.     NML discriminated against the TT-LTC Policyowners in a similar fashion. As all of NML's QLTCI Policyowners are in one Policy Class, its discrimination between the TT.LTC

Policyowners is as obvious as is its discrimination between the RS.LTC and the TT.LTC

Policyowners, as Table C, below, taken from its TT.LTC Rate Increase Filings, confirms:

**TABLE C**

| RATE INCREASES FOR TT.LTC.1010 POLICY POLICYOWNERS | | |
|---|---|---|
| **3-YEAR RANGE** | **6-YEAR RANGE** | **LIFETIME RANGE** |
| Between 0 and 17.5% | Between 6.2 and 25% | Between 8.4% and 35% |
| RATE INCREASES FOR TT.LTC.LP.1010 POLICYOWNERS | | |
| Between 6.2% and 33% | Between 6.6% and 35% | 6.6% and 29% |

81.     NML's Rate Increase Filings provided that it would offer to policyowners who had

chosen a Benefit Period of more than 3 years the option of a shorter Benefit Period in order to

reduce the amount of their premium increase.  However, that offer merely reduced NML's risk

exposure thereby creating the windfall its scheme was intended to produce.

82.     NML's TT.LTC Rate Increase Filings also ignored the requirement that increases

be based on the claims experience of the QLTCI Policy Class, preferring data based on the claims

experience of strangers to the Contract and the Class.

**C.     NML's Rate Increase Filings Were Not Based on the Experience of the Class**

83.     NML's Rate Increase filings unilaterally altered the Policy design in several

respects.  NML's Rate Increase Filings ignored the requirement that rate increases be based on the

claims experience of the Policy Class, which data is critical to an accurate determination of the

appropriate amount of a rate increase. Asserting that the RS.LTC Policyowners' claim experience

(*i.e.,* morbidity) data was "not credible," however, NML advised regulators:

> …we have not relied on our own internal claims experience to develop the
> morbidity assumptions used in this rate increase filing.... Instead, we have relied on
> the 2014 Milliman Guidelines (as described in the Actuarial Memorandum) for our
> current morbidity assumptions and attribute all credibility to those assumptions.

84.     Yet, the Milliman Guidelines, provided by Milliman & Co., an actuarial firm, are

so devoid of merit that NML refused the TDI's request to review them—claiming they were

"proprietary"—and leaving the TDI with nothing more than NML's self-serving characterizations of them.

85.     State LTCI Regulations define the materials that must accompany a Rate Increase Filing.  These include an Actuarial Memorandum and an Actuarial Certificate, which must state that, in determining the proposed rate schedule, the policy design has been taken into consideration.

86.     According to the NML in-house actuary who prepared its *Rate Filings* in 2001 and 2002*, the RS.LTC Policy design precluded unilateral alterations to the Contract and required premium increases to be made "on *a* class basis" and be *"based on the experience of all Policyowners with a policy similar to yours*."

87.     However, according to the NML in-house actuary who prepared its *Rate Increase Filings* from late 2016 into early 2019, the RS.LTC Policy design permitted NML to alter, unilaterally, the Policy term to impose premium increases in a discriminatory manner among at least 153 (51 States x 3 Benefit Periods) "classes" based on the "experience" of phantom policyowners, with phantom policies and phantom claims.

88.     NML performed similar legerdemain with respect to its TT.LTC Policies.

89.     Given NML's numerous, indisputable, material, and unilateral alterations to the Policy by its Rate Increase Filings, at least one of its certificates for each policy type must be false.

**D.     NML CONCEALED ITS TRUE QLTCI POLICY DESIGN**

90.     NML sales materials claim, on one hand, that its rates are based on low lapse rate assumptions. For instance, several of NML's advertising materials state that:

> The pricing of our long-term care insurance reflects low lapse assumptions, which anticipates that our policyowners will keep and use their policies. These low lapse assumptions contribute to better cash flow for investments. This also enables us to

invest in a diversified investment portfolio with a long-term horizon, allowing for better stability with short-term fluctuations exist in the market.

91.     On the other hand, NML's Rate Increase Filings claimed that rate increases were necessary due, in part, to higher loss ratios that are mainly the result of, among other things, *"**lower lapse** and **mortality rates**."* (emphasis added). In short, NML claimed that its lower lapse rates promote policy retention even though they necessitate increased premiums—which cause lapsation.

92.     The American Academy of Actuaries ("AAA") has recognized, however, that "long-term care insurance is a lapse-supported product" and that "to the extent that persistency is higher than expected, the lifetime loss ratio will be higher than expected." A corollary is that higher premiums increase lapsation, which reduces claim costs.

93.     Both NML's original premium rates and its rate increases were determined on a lapse-supported basis, as was confirmed by an NML actuary in a May 24, 2017, letter to the TDI, which states as follows:

> There is some element of lapse support in the pricing of the LTC [sic] in general, so premiums (at issue and any premium increases) would have been higher if reserves released upon lapse (or partial lapse) were not anticipated to go toward the benefit of existing policyowners. In addition, our approach is consistent with other types of coverage changes that reduce benefits (such as reducing the benefit period, increasing the elimination period or reducing the daily/monthly benefit amount) in that reserves released benefit persisting policyowners.

94.     NML's actuary also admitted that persisting policyowners *and* NML both benefited from lapsation, as follows:

> Since this is our first inforce rate increase, we do not have lapse history on which to rely. However, based on consultant and industry feedback, we do not anticipate significant election of contingent benefits upon lapse, even though those benefits will be offered to all policies experiencing a rate increase. *Regardless, any reserves released will reduce our current premium deficit, and will mitigate any future rate increases necessary.* Ultimately, if experience develops more favorably than

currently anticipated, dividends may be paid on these participating policies, subject to Board approval. (emphasis added).

95.     While admitting that its policies are lapse-supported, NML misrepresented the fact that "any reserves [produced by lapsed policies] will be used to reduce our current premium deficit." Such evasiveness is to be expected, as the subject of lapse-supported pricing is taboo in the insurance industry.

96.     NML's misleading response results from the fact that the reserves released by policy lapses were not used to reduce NML's "current premium deficit." In fact, NML had no "current premium deficit," a conclusion the Connecticut Department of Insurance ("CDI") reached after three separate reviews of its Rate Increase Filings from 2017 to 2019.

97.     Rather, as the Department of the Treasury's Federal Insurance Office has succinctly observed, long-term care insurance policy lapses are "*a means of increasing capital without paying claims.*" (emphasis added). NML's annual surpluses and repeated resort to policy death spirals further indicate that its lapse-supported pricing was intended to increase capital and not to cover premium deficits, much less to pay claims.

98.     As early as May 1991, well before it sold its first QLTCI Policy, NML knew that it must disclose the nature of its lapse-supported pricing because it created risks that prevent consumers from making informed purchase decisions. In May 1991, William Koenig, then the Chief Actuary and Senior Vice President of NML, speaking at a Society of Actuaries ("SOA") meeting, was highly critical of lapse-supported pricing, which he viewed as deceptive in the absence of proper disclosure.

99.     During the course of the SOA May 1991 meeting, Mr. Koenig stated, in part, as follows:

When I first learned of [lapse-supported pricing] practices, I made a presentation to my boss to explain what lapse-supported pricing was. At the end of my presentation my boss looked at me and said, "Well? What are the actuaries going to do about this?" It was totally natural, in his mind, that the actuaries, who have the control, would devise a solution.

And I had to tell him, "I'm not sure the actuaries are going to do anything about it because frankly, the people who are coming up with these schemes are probably getting big raises and nice promotions, and they don't have much incentive to scale back. If sales are made based on the assumption that only 10% [of policyowners will persist long-term], the inevitable result is that 90% will be disappointed because they had intended to be part of the 10%.
….

A possible solution is to disclose to the public the mechanism and assumptions behind the illustration. We could disclose that for every one person who survives the 20 years to get to the big payoff, there are nine who will not get that payoff.

Companies have an obligation to explain the downside, the low early case values, and the fact that the company is relying on many people to take those low values in order to fund the long-term bonuses. Companies should have to explain what happens if experience changes.

Among the worst examples are those illustrations that look to be lapse-supported but are explained as being due to newly-rigid underwriting, low expenses, etc. This is the opposite of disclosure. This is active misdirection.

100.    Mr. Koenig continued to serve as NML's Chief Actuary and Senior Vice President until at least 2008, well after NML introduced the RS.LTC Policy in 2002—which did not disclose its lapse-supported policy design or the dangers that design posed to policyowners. Accordingly, NML's sales materials, Policies, and Outlines, all of which concealed the fact that its QLTCI Policies are lapse-supported, are deceptive.

101.    NML used a materially higher lapse rate for its Rate Filing than it used for its Rate Increase Filing, a change that accounted for more than 65% of its premium increase, as NML confirmed in a letter to the TDI of November 20, 2017, as follows:

One of the primary reasons for the large change in projected premiums was the lapse rate assumption change. As described in the actuarial memorandums (*sic*), the original ultimate lapse rate for the RS series was 2.5%, compared to a current

ultimate lapse rate assumption of 0.5%. Since the RS policies are on average 10 years old, and we were only asked to project future premiums, the ultimate lapse rate change had a particularly big impact on results. For example, the table below shows the portion of policyowners still around after 10, 20 and 30 years from today, considering only the ultimate lapse assumption and ignoring the additional impact of lower assumed mortality. Clearly the change in the ultimate lapse rate would have a large impact on the results. We estimate that for the RS series the lapse rate change explains roughly 2/3 of the increase in projected premium.
….

…[W]e have provided an estimate of the change in incurred claims due to the change in ultimate lapse rate.…. As shown [on the spreadsheet provided] the lapse rates represent the lion's share of the change (71%) whereas the mortality/morbidity assumption changes combined represents the remainder.

### E.  NML's Outline Forecloses Any Rate Increase on Any Contract

102.    Code §4980C(c)(1)(A)(vi) incorporates NAIC Model LTCI Regulation 1993, Section 23. This Regulation requires an insurer to provide an Outline of Coverage ("Outline"), which, at Para. E. 3. (d) of the Form of Outline set forth in the Regulation, requires an insurer to disclose "whether or not the company has a right to change premiums and if such right exists, *describe clearly and concisely each circumstance under which [sic] premium may change*." (emphasis added).

103.    Although the IRS QLTCI Regulation requires that NML's Contract and Outline strictly comply with the NAIC Model Regulations that Congress added to the Code, neither NML's Contract nor its Outline mention, much less "clearly and concisely" describe, *any* "circumstance" under which the premium may change. To the contrary, the Contract and Outline merely state only that "Premiums may be increased by class." But "by class" is not a "circumstance" that necessitates a rate increase; it defines the manner in which a rate increase may be implemented.

104.    The circumstances that NML first described in its Rate Increase Filing confirm the complete failure of its Contract and Outline to disclose any circumstance. The Actuarial Memoranda submitted in support of NML's Rate Increase Filings state that, "[a] rate increase is

necessary at this time due to significantly higher anticipated future and lifetime loss ratios. The higher loss ratios are mainly the result of **longer claim continuance** with a **greater effect on longer benefit periods**, combined with **lower lapse** and **mortality rates**." (emphasis added).

105. NML's Outline also failed to disclose, much less clearly and concisely disclose, that lower lapse rates would result in significantly higher anticipated future and lifetime loss ratios necessitating a premium increase, a circumstance NML first alluded to on May 24, 2017, in responses to the TDI's questions concerning its Rate Increase Filings.

106. Neither of these—nor any other—circumstance is mentioned in NML's Contract or Outline. Nor does NML's Rate Increase Filing claim that "by class" is a "circumstance." By failing to describe any circumstance under which a premium change may occur, NML forfeited any right to any rate increase on any of its RS.LTCI or TT.LTCI Policies.

## VIII. Reinsurance of NML's QLTCI Policies

107. In February 1999, when NML introduced its RR.LTC.(0798) Policy, its first QLTCI policy, it reinsured with a third-party 80% of that policy block "*to limit its exposure to significant losses in the event that adverse experience developed on a sizable portion of the business and to recover a portion of the benefits paid*." (emphasis added).

108. However, in 2017, early in its Rate Increase Campaign (a Campaign predicated on its urgent need to stem huge future losses), NML recaptured the reinsured RR.LTC Policies. It did so: (1) even though it increased its in-force QLTCI contracts by a factor of 17; (2) the recaptured policies were the first policies it issued and posed the greatest risk of significant loss, and (3) while it purported to be concerned with the potential of future losses. It then reinsured 100% of NLTC's QLTCI business without concern for exposure to significant losses.

## IX. NML ADVISES PLAINTIFFS OF THEIR RATE INCREASES

109. On May 2, 2018, NML wrote to Plaintiffs, stating that while it was "committed to ensuring that long-term care insurance benefits are available when you need them[, w]e have made the difficult but necessary decision to increase the premium on your [LTCI] policy."

110. NML's letter advised that "[w]e are increasing premiums for all policyowners similar to you, who purchased their policy in Texas." This was Plaintiffs' first hint that the Policy Class was not a national class.

111. As NML explained, as "people are living longer… the anticipated cost of future LTC claims for the industry" has increased. Notably, NML did not claim that *its* original cost projections were understated, nor could it because its nationwide claims experience was significantly *more favorable* than it had originally projected, as the Connecticut Regulators have repeatedly confirmed.

112. NML further claimed that "[o]ur analysis shows that claims are now anticipated to be much higher than we originally predicted when we set the premium for your policy." While literally accurate, it is only so because NML's "analysis" was based on data that has nothing to do with the Policy Class.

113. Table D shows the premium increase on Plaintiffs' policies as follows:

**TABLE D**

| Current Annual Premium | New Annual Premium | Increased Amount | Effective Date |
|---|---|---|---|
| $6,679.30 | $8,557.80 | $1,878.50 | August 8, 2018 |

114. Table E shows the increase that will follow the initial increase, as follows:

**TABLE E**

| Effective Date | Future Annual Premium |
|---|---|
| August 8, 2018 | $8,557.50 |
| August 8, 2021 | 10,965.00 |

115.    Consistent with its death spiral tactic, NML also warned that further rate increases may be in the offing, stating: "While premium rates are not guaranteed, due to the size of the increases approved, it is unlikely that we will need to request another rate increase in Texas *if our pricing assumptions do not change*. But, if things do get worse, further increases may be necessary sometime in the future." (emphasis added). As NML well-knew, the very nature of its scheme ensured that "things [would] get worse," in particular because NML considers itself free to unilaterally alter the Contract and can always change its "pricing assumptions."

116.    NML's May 2 letter then listed Plaintiffs' options, a series of Hobson's Choices that entailed lower benefits, higher premiums or policy lapse. Maintaining the original coverage and premium was not an option.

117.    NML's scheme required Plaintiffs to make elections that significantly increased their premiums and significantly reduced their Benefit Account Value from an "Unlimited" amount of benefits to $751,936.50 in benefits. While that may seem substantial, in 2005, NML reported annual nursing-home costs were $64,600 and projected them to increase to $350,600 by 2035. It also advised that a person with Alzheimer's lived an average of eight years after onset of the disease, while some lived for as long as 20 years.

## X.    PLAINTIFFS' PROTEST LETTER

118.    On August 3, 2018, Plaintiffs wrote to NML protesting its rate increases, as follows:

> My wife and I are writing to protest the extraordinary and unauthorized premium increases … that [NLTC] has imposed on Policyowners who purchased Long Term Care Policies … similar to those we purchased in 2007.
>
> [NLTC] has not implemented these increases in a manner consistent with the [policies'] terms. Indeed, while the [policies] permit [NLTC] to increase premiums, it may only do so in the manner stated in the policies. As [NLTC] did not comply with those terms, it has neither the right to increased premiums nor to use premium increases as a pretext to force Policyowners to relinquish significant and irreplaceable rights.

While we are submitting herewith the Personalized Option Forms, previously provided by [NLTC], we do so only under protest and while reserving all rights to seek redress from appropriated (*sic*) agencies and courts for [NLTC's] unauthorized actions.

## XI. NML'S ASSISTANT GENERAL COUNSEL DESCRIBES ITS SCHEME

### 1. NML PLANNED ITS SCHEME FROM INCEPTION

119. On October 8 and November 8, 2018, NML's Assistant General Counsel ("AGC") wrote to Plaintiffs, confirming that NML had: (1) created innumerable "classes"; (2) secretly assigned policyholders to those "classes"; (3) used its classes in applications for discriminatory rate increases; which, when approved, (4) it imposed on its policyowners, who were offered the choice of increased premiums, reduced benefits or, ultimately, lapsed policies (the "Scheme").

120. NML's November 8 letter states that, at a time it identified as "at issue," but unbeknownst to, and intentionally concealed from, the policyowners, NML created its "classes" in a manner contrary to law and used them "over the life of the Policy," as follows:

These policy characteristics were defined at issue and are not changed unilaterally by the company over the life of the policy and, therefore, the classes that result from these various policy characteristics do not change either.

### 2. NML'S UNLAWFUL CLASSES

121. The October 8th letter quoted the Policy provision that permits premiums to be changed "by class" and cited 28 TAC §3.3843, implying that it supported NML's definition, as follows:

Class means those items which are used to determine the insured's premium rate at issue; almost any policy characteristic at the time of issue such as age, state, series, benefit period, underwriting rating classification, and the optional additional benefits which are included may be used to further differentiate actuarial supportable classes.

122.    When Plaintiffs questioned his implication, the AGC retracted his claim that §3.3843 TAC permitted multiple classes, claiming instead that NML based its classes on "*generally accepted actuarial principles*," presumably on the theory that such principles trump the Code, the IRS, State Regulations, and the Contract.

### 3.    NML'S INNUMERABLE CLASSES

123.    The AGC identified its innumerable "classes," in a manner that is contrary to the requirements of NAIC Model Regulation Sec. 7.A.(2), as incorporated by Code §7702B(g)(2)-(A)(i)(I), as follows:

> The classes that exist for the RS series are determined by the various policy characteristics that premiums could vary by [*sic*]. The list below summarizes these various policy characteristics and the resulting policy classes are defined by the permutations of them, which results in many subsets-of-classes.

124.    The AGC's "various policy characteristics" and their "permutations" that "result in many subsets of classes," are as follows:

| CHARACTERISTICS | PERMUTATIONS |
|---|---|
| State of Issue | x 51 |
| Issue age | x 5+ |
| Policy Size (maximum daily benefits) | x 4+ |
| Beginning date (options : 46-day, 61-day, 91-day or 100%) | x 4 |
| Premium mode (options: annual, semi-annual, quarterly, monthly) | x 4 |
| Additional benefits | x 4 |
| Benefit Period (options:  3-year, 6-year, or lifetime) | x 3 |
| Spousal code (options:  single or spousal) | x 2 |
| Home healthcare reimbursement level (options:  50% or 100%) | x 2 |

125.    Based on nothing more than *ipse dixit,* NML created so many "classes" and "subsets of classes" that their permutations exponentially exceed the 94,920 RS.LTC and the 71,708 TT.LTC Policyowners. Indeed, they produce hundreds of thousands – if not more – subsets of classes.  NML's Scheme emasculates the non-discriminatory purpose of the  *single class* requirement of the Code and State LTCI Regulations.

126.   NML made no application to any state or federal agency for permission to unilaterally alter the Contracts, to create its fictitious classes and, given NML's obligation to comply with the QLTCI provisions of the Code, no state had authority to permit NML to apportion rates in a discriminatory manner.  Accordingly, no filed rate justifies NML's actions.

### 4.   NML Applies Its Discriminatory Rates

127.   The November 8th letter also confirmed that NML used fictitious classes to determine and apportion the rate increases for Plaintiffs and the Policy Class, as follows:

> *The classes that were used to determine the premium rate increases approved by the TDI for the policies included in the Texas RS rate increase filing are based on the policy characteristics of the state of issue, policy series, issue age, and benefit period.*

### XII.   NML'S MOTIVE

128.   NML's multi-billion-dollar reserves and surplus provided a huge incentive to reduce future claims and arrogate those monies to itself.  As demonstrated in Table F, from 2002 through 2016, NML's Earned Premiums on its QLTCI policies increased in every year but one, while Incurred Claims remained nominal in relation to sales. During those 14 years, as premiums remained level, sales ballooned Earned Premiums to $241,322,095 from $22,856,670 in 2003, the first full year of sales.

**TABLE F**

| Year | Earned Premiums | $ Amount Change From Prior Year | % Change From Prior Year | Incurred Claims | Actual Loss Ratio % | Expctd Loss Ratio | Actual to Exptd |
|---|---|---|---|---|---|---|---|
| 2002 | 6,273,583 | | | 81,898 | 1.3 | 3.4 | 0.385 |
| 2003 | 22,856,670 | 16,583,087 | 264.3 | 332,615 | 1.5 | 4.0 | 0.365 |
| 2004 | 42,036,768 | 19,180,098 | 83.9 | 791,178 | 1.9 | 5.2 | 0.361 |
| 2005 | 63,647,217 | 21,610,449 | 51.4 | 1,913,414 | 3.0 | 6.2 | 0.485 |
| 2006 | 88,737,722 | 25,090,505 | 39.4 | 4,844,336 | 5.5 | 8.1 | 0.674 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2007 | 114,294,824 | 25,557,102 | 28.8 | 6,688,926 | 5.9 | 9.6 | 0.607 |
| 2008 | 147,439,151 | 33,144,327 | 28.9 | 10,149,002 | 6.9 | 11.3 | 0.609 |
| 2009 | 175,882,933 | 28,433,782 | 19.2 | 18,142,835 | 10.3 | 13.4 | 0.767 |
| 2010 | 209,689,874 | 33,806,941 | 19.2 | 23,413,545 | 11.2 | 15.5 | 0.722 |
| July 2010: TT.LTC Policy Introduced - - - April 2011: RS.LTC Policy Discontinued | | | | | | | |
| 2011 | 226,710,258 | 17,020,384 | 08.1 | 23,254,294 | 10.3 | 18.5 | 0.558 |
| 2012 | 221,386,516 | -5,323,742 | ? | 39,410,337 | 17.8 | 22.4 | 0.794 |
| 2013 | 228,325,318 | 6,938,802 | 03.1 | 28,612,132 | 12.5 | 26.5 | 0.473 |
| 2014 | 232,440,705 | 4,115,387 | 01.8 | 35,402,501 | 15.2 | 31.3 | 0.487 |
| 2015 | 237,151,614 | 4,710,909 | 02.2 | 53,863,427 | 22.7 | 36.2 | 0.627 |
| 2016 | 241,322,095 | 4,170,481 | 01.7 | 77,764,930 | 32.2 | 41.2 | 0.782 |
| | $2,258,195,248 | | | $324,747,276 | | | |

129.    Consistent with the Treasury Department's Federal Insurance Office explanation that: "***lapsed policies allow insurers to accumulate capital without the payment of claims***…," by reducing policy benefits an insurer reduces its risk exposure, which converts reserves into capital without payment of claims, as NML implicitly admits.

130.    In 2018, NML reported financial results that included "Exceptional surplus growth, an increase in operating gain, and an all-time-high General Account investment portfolio."

131.    On February 25, 2020, NML announced that it had increased its surplus to the highest level in its history during 2019 and expected to pay out a record $6 billion in dividends to whole life, term life, disability and annuity policy owners.

132.    NML's total surplus—an insurer's cushion against the unexpected and a key measure of its overall financial strength—grew from $20 billion in 2016, to 20.8 billion in 2017, to $26.7 billion in 2018 and to $30.4 billion in 2019.

133.    While NML's Whole Life, Adjustable CompLife, Disability and some annuity Policyowners received dividends—its QLTCI Policyowners, whose policies were also participating, did not.  Over the course of its Rate Increase Campaign alone, NML paid out more than $16 billion in dividends to policyowners other than QLTCI Policyowners.

134. NML's Scheme continues, for several states, including Texas, permitted it to impose further rate increases without additional Filings. NML has projected that it would receive over $1 billion in Earned Premiums in each of 2016, 2017, 2018 and 2019 and many billions more through 2063.

## XIII. FACTORS THAT FACILITATED NML'S SCHEME

### A. NML'S FALSE DOCUMENTATION

135. NML's ongoing Scheme denies to thousands of policyowners threatened with dementia, cancer, Alzheimer's or any number of other debilitating conditions associated with advanced age, the benefits they paid for over many years. It does so by undermining every consumer protection that Congress and the states had put in place well-before NML sold its first QLTCI policy.

136. NML's Scheme has extended over 18 years, deceived more than 170,000 insureds and 51 State Insurance Regulators by the use of thousands of documents that contain false and deceptive statements and fail to disclose material facts.

137. Essential to the Scheme was the need to mislead regulators in order to defraud policyowners. Regulators rely on the integrity of applications provided by insurers. NML's Regulatory Filings included Actuarial Memoranda and Actuarial Certificates. The latter, signed by NML actuaries, state, in part, that "[t]o the best of my knowledge and judgment, *this filing complies with the laws and regulations of your state* and the benefits are reasonable in relation to the premiums charged." (emphasis added). Yet, the Certificates are plainly central to NML's Scheme.

138. NML's Scheme required that it create the appearance of compliance with the Code, State LTCI Regulations, and the Contracts. Thus, cover letters with its Filings claimed that they

complied with all federal and state requirements, while its Rate Filings included Policies, Outlines and other documents that refer to only one class. Such subterfuge was necessary for its Scheme required the sale of thousands of contracts to garner the hundreds of millions of premium dollars that NML's Scheme anticipated.

139.    NML's Brochures, Disclosures, Policy Forms, and other materials furthered its Scheme by encouraging the belief that only one Policy Class existed, that NML would comply with the Code, and that rate increases would be apportioned as required by law and the Policy.

140.    Thus, the time element was ***critical***.  Between its initial policy sales and its Rate Increase Filings, NML was handsomely rewarded while it amassed hundreds of millions of dollars in premiums and earnings thereon, most of which it intended to arrogate unto itself when the time was ripe by forcing policyowners to relinquish their right to benefits they had paid for over many years.

### B.    IRS RELIANCE ON STATE REGULATORS

141.    According to a 2008 Study by the U.S. General Accounting Office, the IRS relies on State Regulators to monitor an insurer's compliance with the rules concerning Tax-Qualified LTCI policies. As the GAO Study reported:

> Tax-qualified policies under HIPAA must…comply with certain provisions of the NAIC LTCI model act and regulation in effect as of January 1993. The … [IRS] issued regulations in 1998 implementing some of the HIPAA standards.  *However, according to IRS officials, the agency generally relies on states to ensure that policies marketed as tax-qualified meet HIPAA requirements.*  In 2002, 90% of LTCI policies were tax-qualified. (emphasis added).

### C.    RATE INCREASE FILING REVIEWERS DO NOT REVIEW CONTRACTS

142.    Such reliance may be misplaced, as reviewers, such as those with the TDI, are trained as actuaries and not as lawyers or tax experts. Also, states do not require reviewers to

determine whether a Rate Increase Filing complies with HIPAA, the State LTCI Regulations, the policy, or even an insurer's prior Rate Filings.

143. As a national study conducted for AARP in 2002 concluded, most states fail to gather all of the information necessary for a comprehensive review of the factors that affect LTCI premium rate increases while only six collected the information necessary to justify granting a Rate Increase Filing.

144. In Texas, reviewers of Rate Increase Filings use a checklist, prepared by the TDI's Regulatory Policy Division Life and Health Actuarial Office, which specifies 85 items a reviewer must consider.

145. While comprehensive, the Texas checklist does not mention the Code's requirements for Tax-Qualified LTCI policies or require Reviewers to: (a) compare the policy terms with the insurer's description of them, or (b) determine if the insurer intends to apportion rate increases in a manner other than required by the Code, State LTCI Regulations, or the Policy.

146. However, regulatory failures do not absolve an insurer from its nondelegable duty to comply with the Code, the State LTCI Laws, and the Contract terms.

## XIV. NML FRAUDULENTLY CONCEALED ITS SCHEME

147. On April 12, 2018, NML wrote to the Texas RS.LTC Policyowners, including Plaintiffs, advising that the TDI had approved NML's Rate Increase Request, and stating as follows:

> When your premium was originally determined, it was based on a number of assumptions looking into the future. We made what we believed to be appropriate assumptions about expected claims activity, how many people would keep their coverage inforce, and life expectancy. That enabled us to avoid an inforce premium rate increase longer than most other companies. Unfortunately, experience projections with respect to those factors are proving to be more unfavorable than even our conservative assumptions.

148.    NML's letter concealed, among other things, its failure to use the claims experience of the Policy Class in its Rate Increase Filings and that the Connecticut Department of Insurance had repeatedly determined that NML's actual Nationwide and State claim experience from 2002 until 2016 was significantly *more* favorable than NML had originally projected, necessitating the Milliman Guidelines to invent a contrary story.

149.    Insurers are also required to file copies of their LTCI advertisements with State Insurance Departments; the Texas Regulation is 28 TAC §3.3838.  It seeks to prevent LTCI advertising from serving as a "source of false, misleading, or deceptive marketing practices."

150.    Nevertheless, in 2018, NML published a PR piece designed to create the appearance that its rate increases complied with the law and the Contract.  Entitled: "*About Long-Term Care Insurance Premium Increases*," it falsely claimed as follows:

> Our long-term care insurance policies are "guaranteed renewable" for life, which means that as long as you continue to pay the premium, we cannot cancel or change your policy, other than to adjust premiums as may be necessary by class. This means that the premium rates for this product may be increased, though they cannot be increased due to a given person's increasing age or declining health; *rates may go up based on the claim experience of all policyholders with a policy similar to yours*. (emphasis added).

151.    NML's PR piece appeared *toward the end* of its 2016-2018 Campaign, in which its Actuarial Memoranda admitted that the critical morbidity factor was not "based on the experience of all policyowners with a policy similar to yours."

152.    On August 3, 2018, NML sent the same misrepresentations to Plaintiffs, advising, that:  "rates may go up based on the experience of all policyowners with a policy similar to yours," even though, in fact, its filings were based on the projected "experience" of phantom policyowners with phantom policies issued by phantom insurers.

## XV.   SCIENTER, CAUSATION & RELIANCE

153.   Defendants, with scienter, intent to deceive, manipulate and defraud, and with reckless disregard for the truth, used well-recognized acts and practices in their Scheme to defraud.

154.   NML encouraged policyowner reliance by claiming that its LTCI Policies provided a "future benefit," assuring them that "our [financial] ratings and reputation represent our promise to pay our claims and meet our obligations" and to: "Rest assured in our promise to be there with you when you need us most."

155.   Plaintiffs and class members all can be presumed to have relied on the Contract, the Outline, and Rate Increase Disclosure, among other things, to provide complete and accurate information concerning the Contracts and NML's intentions concerning them.  Plaintiffs did not know and could not have known that NML's representations were false and omitted to disclose material facts.  No one would have purchased an NML QLTCI Contract and paid significant premiums for over a decade had NML disclosed the truth.

156.   Had the IRS or state regulators known that NML did not intend its QLTCI Policies to be a "**qualified** long-term care insurance contract under section 7702B(b) of the Internal Revenue Code of 1986," no NML QLTCI Policy would have been approved for sale.

157.   NML's acts, practices, and course of conduct proximately caused the injuries and damages sustained by the Plaintiffs.

## XVI.   CLASS ACTION ALLEGATIONS

158.   Plaintiffs bring this suit individually and as a class action, as it satisfies the requirements of Federal Rule of Civil Procedure 23.  The Rule 23 National Class consists of all individuals who purchased NML's RS.LTC and TT.LTC QLTCI series Insurance Policies, excluding: (a) Defendants, their affiliates, and their respective current or past officers, directors,

employees, agents, lawyers, and actuaries, and (b) judicial officials before whom this action is pending and members of their immediate families and staff (the "Policy Class").

159.    While the exact number of class members is unknown, the Rule 23 Class consists of at least 170,000 persons nationwide, the number of RS.LTC and TT.LTC Policies that NML reported sold between 2002 and 2014. The Rule 23 Class is so numerous that joinder of all members is impracticable. The identity of the Rule 23 Class members can be determined by NML's records.

160.    Questions of law and fact are not only common to the members of the Rule 23 Class, they predominate over questions affecting individual members.  Questions of fact and law common to the Rule 23 Class, include:

> A.  Whether NML misrepresented that the Contracts were "intended to be a qualified long-term care insurance contract under section 7702B(b) of the Internal Revenue Code of 1986";
>
> B.  Whether NML complied with the standards required by the Code, IRS Regulations, and State law;
>
> C.  Whether the standards of the Code, IRS Regulations, State law, and the Policy permit more than one Policy Class;
>
> D.  Whether NML used fictitious classes or unauthorized data to obtain premium increases;
>
> E.  Whether NML altered the QLTCI Contracts contrary to law;
>
> F.  Whether NML breached its QLTCI Contracts;
>
> G.  Whether NML violated state consumer protection and insurance laws in connection with its QLTCI Contracts;
>
> H.  Whether NML fraudulently misrepresented or concealed material facts concerning its QLTCI Contracts;
>
> I.  Whether NML's actions were reckless, malicious, or willful; and,

J. Whether Plaintiff and the Class are entitled to rescission, restitution, disgorgement or damages, including recessionary, compensatory, and multiple or punitive damages; and declaratory and injunctive relief.

161. The nature and scope of NML's fraudulent Scheme permits each element of each statutory and common law claim to be proven on a class-wide basis. Plaintiffs will prove any element necessary to ensure that Defendants' right to Due Process is protected.

162. Plaintiffs' claims are typical of those of the Class; all Class members purchased QLTCI Policies from NML. Plaintiffs and the Class suffered similar injuries caused by the same course of unlawful conduct, and accordingly Plaintiffs' interests are coincident with and not antagonistic to the Class.

163. Plaintiffs will fairly, adequately, and vigorously represent the interests of the Class in prosecuting its claims against NML. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

164. Class action treatment of this action is superior to any alternative method for the fair and efficient adjudication and resolution of these claims; such treatment will permit a large number of similarly-situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that individual actions would require.

165. The benefits of proceeding as a Class Action include providing injured persons with an efficient and expeditious determination of their claims in a manner not possible on an individual basis, which substantially outweighs any difficulties that may arise in the management of this class action. The prosecution of separate actions would create a risk of inconsistent standards of conduct under the Code and uniform State LTCI Regulations.

166.    Further, Plaintiffs, for the same facts and reasoning set forth above regarding the

certifiability of the National Class, seek to represent a Texas Subclass of the National Class whose

members also bring claims under the Texas Deceptive, Unfair, and Prohibited Practices in the

Business of Insurance Act, as set forth below.

## XVII.  RELIEF SOUGHT

167.    NML's records will permit a precise calculation of the damages the Rule 23

National Class and Texas Subclass each sustained, which calculations are currently knowable only

by NML and/or information in NML's possession or control.  Without discovery, Plaintiffs cannot

determine these amounts. Moreover, each policyowner may also have the option to reaffirm their

void Contracts, which affects the nature and amount of each policyowner's relief.

168.    However, an estimate of the minimum amount of damages, or restitutionary

damages, sustained by Plaintiffs is as follows:

> A.  In 2019, each Plaintiffs' premium was increased to $8,557.80 from $6679.30, which each Plaintiff paid;
>
> B.  From 2007 through 2019, Plaintiffs paid to NLTC a total of $150,701 in premiums;
>
> C.  The rate increase NML imposed on the 4,621 Texas RS.LTC Policyowners equaled $8,958,468 in both 2018 and 2019, for an aggregate total of $17,916,936.
>
> D.  In 2017, the first full year after NML's Rate Increase Campaign began, NML's annual premiums increased on its RL.LTC Policies in the amount of $240,395,996.

169.    Plaintiffs and the Rule 23 Class are entitled to restitution of, or restitutionary

damages for, all premiums paid by reason of NML's unilateral alterations of the Contracts;

disgorgement of all earnings thereon; and, at their option, to reinstatement of the original terms of

their Contracts, including the original premium schedules and benefit classifications and appropriate injunctive relief.

170. Because all of the RS.LTC and TT.LTC Policies are void, Plaintiffs and those members of the Rule 23 Class who elect not to reinstate or to retain their policies, are entitled to restitution or restitutionary damages in an amount equal to all premiums paid, to disgorgement of all earnings thereon, and to compensation for any additional costs incurred in replacing the Policies, an amount that may well exceed $3 billion, which amount increases daily as policyowners continue to pay premiums based on NML's Scheme.

171. Plaintiffs and the Rule 23 Class are entitled to compensation for any other damages sustained due to the Scheme, including by reason of any denial of any federal or state tax benefits and any interest or penalties assessed thereon, are further entitled to multiple or punitive damages, depending on applicable state law, interest, costs, actual attorneys' fees, and other relief that the court finds just and proper.

## XVIII.    CLAIMS FOR RELIEF

### 1.    BREACH OF CONTRACT (NATIONAL CLASS)

172. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

173. As QLTCI Contracts, the provisions of Plaintiffs' Policies are to be construed in accordance with the Code, the IRS QLTCI Regulations, and the parallel State LTCI Regulations, as well as with federal common law.

174. When a regulated entity enters into a contract with a consumer, any rate increase that the entity obtains by materially and unilaterally altering the terms of the contract is void *ab initio*.

175.     NML breached the Contract by unilaterally altering material terms of the Contract thereby rendering them illusory.  NML's unilateral alterations void the rate increases and render the Contracts illusionary and void.

176.     Plaintiffs have performed all conditions precedent.

### 2.     BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING (NATIONAL CLASS)

177.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

178.     In every state but Michigan, there is in every insurance contract an implied covenant of good faith and fair dealing, which required NML to act in good faith, to deal fairly and honestly with policyowners and to do nothing that interfered with, injured or deprived them of their rights and benefits under their contracts.

179.     Defendants breached their covenant of good faith and fair dealing.

### 3.     COMMON LAW FRAUD (NATIONAL CLASS)

180.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

181.     NML engaged in the species of fraud known to the law as either fraud in the essence or fraud in the *factum*.  It occurs where there is a "misrepresentation as to the character or essential terms of a proposed contract" and a party signs the contract without knowing or having a "reasonable opportunity to know of its character or essential terms."  *Restatement (Second) of Contracts* § 163 comment *a* (1981).

182.     NML's QLTCI Contracts were also illusory by reason of its unilateral alterations of their terms.

183.     Because the Contract type was determined by Congress, which provided federal tax benefits to encourage their sale, NML was required to strictly comply with their essential terms, as established by the Code and the IRS QLTCI Regulation. Plaintiffs and the Rule 23 National

Class (inclusive of the Texas Subclass) did not know and could not have known that NML materially altered the Contracts it sold from the type of QLTCI Contract that is required by law.

### 4. TEXAS DECEPTIVE, UNFAIR AND PROHIBITED PRACTICES IN THE BUSINESS OF INSURANCE ACT (TEXAS SUBCLASS)

184. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

185. Sec. 541.003, Tex. Ins. Code, "Unfair Methods of Competition and Unfair or Deceptive Acts or Practices Prohibited," provides that "[a] person may not engage in this state in a trade practice that is defined in this chapter as or determined under this chapter to be an … unfair or deceptive act or practice in the business of insurance."

186. Sec. 541.051, TIC, Misrepresentations Regarding Policy or Insurer, provides as follows:

> It is … an unfair or deceptive act or practice in the business of insurance to: (1) make, issue or circulate or cause to be made, issued or circulated a[] … statement misrepresenting with respect to a policy issued or to be issued: (A) the terms of the policy; (B) the benefits or advantages promised by the policy, among other things.

187. Sec. 541.061, TIC, Misrepresentation of Insurance Policy, provides as follows:

> "It is …an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by: making an untrue statement of material fact; failing to state a material fact necessary to make other statements not made misleading, considering the circumstances under which the statements were made; making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact; making a material misstatement of law; or failing to disclose a matter required by law to be disclosed, including failing to make a disclosure in accordance with another provision of this code."

188. Defendants' violated §§541.051 and 541.061 TIC by making, issuing and circulating statements that misrepresented the policy terms, benefits, and advantages and failed to state material facts necessary to make other statements not misleading in a manner that would mislead a reasonably prudent person to false conclusions; making material misstatements of law, and by failing to disclose matters required by law to be disclosed.

189.    For purposes of §§541.051 and 541.061, Defendants' violations occurred on August 3, 2018, the date Plaintiffs were damaged by having to respond to NML's unlawful demand that they make the elections required by its letter of May 2, 2018.

190.    NML acted with fraud, malice, or gross negligence as those terms are used in Tex. Civ. Prac. & Rem. Code §41.00.

## REQUEST FOR RELEIF

WHEREFORE, Plaintiffs, on their behalf and on behalf of the proposed Class, demand joint and several judgments against Defendants, that grants Plaintiffs, the Rule 23 National Class and Texas Subclass, including, but not limited to:

A.  Orders that this suit may be maintained as a class action with subclass, declares that Plaintiffs are proper representatives of the Rule 23 National Class and Texas Subclass, and directs that reasonable notice of this suit be given to Class Members under Rule 23(c)(2) in one notice package;

B.  Grants Plaintiffs and the Rule 23 National Class, and Texas Subclass as available, equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

C.  Grants Plaintiffs and the Rule 23 National Class, and Texas Subclass where appropriate, rescission and restitutionary damages, statutory damages, actual damages and, where applicable, multiple or punitive, or both, damages in an amount to be determined at trial,  including interest, and;

D.   Grants Plaintiffs and the Rule 23 National Class/Texas Subclass their costs of investigation and reasonable attorneys' fees as provided by law; and, such further relief as the court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Rule 23 National Class and Texas Subclass, demand a trial by jury on all issues so triable.

Dated: July 16, 2020

Respectfully submitted,

/s *Timothy W. Burns*

Timothy W. Burns
State Bar No. 1068086
Jesse J. Bair
State Bar No. 1083779
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Gary Lynch (*pro hac vice* forthcoming)
Katrina Carroll (*pro hac vice* forthcoming)
Ed Ciolko (*pro hac vice* forthcoming)
**CARLSON LYNCH**
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222
Tel. (412) 322-9243
glynch@carlsonlynch.com
kcarroll@carlsonlynch.com
ECiolko@carlsonlynch.com

Michael J. Freed (*pro hac vice* forthcoming)
Robert J. Wozniak, Jr. (*pro hac vice*
forthcoming)
**FREED KANNER LONDON & MILLEN
LLC**
2201 Waukegan Rd, Suite 130
Bannockburn, IL 60015
Tel. (224) 632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com

Jonathan M. Jagher (*pro hac vice*
forthcoming)
**FREED KANNER LONDON & MILLEN
LLC**
923 Fayette Street
Conshohocken, PA  19428
Tel. (610) 234-6487
jjagher@fklmlaw.com

*Attorneys for Plaintiffs*